FILED
2012 May-25  AM 08:53
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **KEITH DAVIS,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.: 2:10-CV-2075-RDP** |
| | } | |
| **DUNN CONSTRUCTION** | } | |
| **COMPANY, INC.,** | } | |
| | } | |
| **Defendant.** | } | |

## <u>MEMORANDUM OPINION</u>

The court has before it Defendant Dunn Construction Company, Inc.'s Motion for Summary Judgment (Doc. # 30) and supporting materials (Docs. # 31 and # 32), filed on February 15, 2012. The Motion for Summary Judgment has been fully briefed (Docs. # 35, 37, 38, and 47). For the reasons discussed below, the court finds that Defendant's Motion for Summary Judgment is due to be granted.

Plaintiff's Amended Complaint asserts violations of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* ("Title VII"), and the Civil Rights Act of 1866, as amended, 42 U.S.C. § 1981 ("§ 1981"). (Doc. # 17 at 1). The Amended Complaint asserts race discrimination and hostile work environment claims (Count One), retaliation claims (Count Two), and generally references a constructive discharge. Specifically, Plaintiff alleges that he (1) was paid less than Caucasian employees performing similar duties, (2) was subject to racially offensive language at work, (3) performed leadman duties without receiving commensurate pay, (4) was denied a leadman position, (5) was harassed in retaliation for engaging in protected activity, and (6) was constructively discharged on or about July 31, 2008. (Doc. # 17 ¶¶ 5–6, 9–10, 22).

Title VII prohibits discrimination against an employee by the employer on the basis of race "with respect to [] compensation, terms, conditions, or privileges of employment," and discriminatory practices that would "deprive any individual of employment opportunities or otherwise adversely affect his status as an employee . . . ." 42 U.S.C. § 2000e-2(a)(1).  Section 1981 proscribes discrimination in the making and enforcing of contracts (including employment contracts) based on a person's race.  42 U.S.C. § 1981.  Both § 1981 and  Title VII prohibit an employer from retaliating against an employee for reporting discrimination or filing a charge of discrimination. *CBOCS West, Inc., v. Humphries*, 553 U.S. 442, 457 (2008); *see* 42 U.S.C. § 2000e-3(a).  Claims under Title VII and § 1981 are analyzed under the same standards.  *See e.g., Bryant v. Jones*, 575 F. 3d 1281, 1296 n.20 (11th Cir. 2009) (discrimination claims, including hostile work environment claims, under Title VII and § 1981 are subject to the same standards of proof and analyzed under the same framework); *Goldsmith v. Bagby Elevator Co., Inc.*, 513 F. 3d 1261, 1277 (11th Cir. 2008) (retaliation claims).

After a careful review of the record and the arguments made in this case, the court concludes that the record evidence is insufficient for Plaintiff to establish any of his claims.  Further, Plaintiff has not exhausted his administrative remedies with respect to his Title VII constructive discharge claim.  As set forth in more detail below, Plaintiff's claims in this case fail to pass muster under Rule 56 and Defendant is entitled to judgment in its favor.

## I.    STANDARD OR REVIEW

Under Federal Rule of Civil Procedure 56(a), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to

judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000). Affidavits or declarations "used to support or oppose a motion must be made on personal knowledge." Fed. R. Civ. P. 56(c)(4). The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings that the moving party believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp.*, 477 U.S. at 323. No genuine issue of material fact exists when there is a "complete failure of proof concerning an essential element of the nonmoving party's case." *Id*. Once the moving party has met its burden, Rule 56(a) requires the nonmoving party to go beyond the pleadings and by his own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. *Id*. at 324.

The substantive law will identify which facts are material and which are irrelevant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Chapman*, 229 F.3d at 1023. All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the nonmovant. *Chapman*, 229 F.3d at 1023. A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *Chapman*, 229 F.3d at 1023. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Anderson*, 477 U.S. at 249–50. The method used by the party moving for summary judgment to discharge its initial burden depends on whether that party bears the burden of proof on the issue at trial. *See Fitzpatrick v. City of Atl.*, 2 F.3d 1112, 1115–17 (11th Cir. 1993) (citing *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428 (11th Cir. 1991) (en banc)). If the moving party bears the burden of proof at trial, then it can only meet its initial burden on summary judgment by coming

forward with positive evidence demonstrating the absence of a genuine issue of material fact (*i.e.*, facts that would entitle it to a directed verdict if not controverted at trial), *Fitzpatrick*, 2 F.3d at 1115, and by showing that "on all the essential elements of its case . . . no reasonable jury could find for the nonmoving party," *Four Parcels of Real Prop.*, 941 F.2d at 1438.  Once the moving party makes such a showing, the burden shifts to the nonmoving party to produce significant, probative evidence demonstrating a genuine issue for trial.

On the other hand, if the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in at least one of two ways.  First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the nonmoving party will be unable to prove its case at trial.  Once the moving party satisfies its burden using this method, the nonmoving party must respond with positive evidence sufficient to resist a motion for directed verdict at trial.  Second, a moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to affirmatively show the absence of evidence in the record to support a judgment for the nonmoving party on the issue in question.  This method requires more than a simple statement that the nonmoving party cannot meet its burden at trial but does not require evidence negating the nonmovant's claim; it simply requires the movant to point out to the district court that there is an absence of evidence to support the nonmoving party's case.  *Fitzpatrick*, 2 F.3d at 1115–16.  If the movant meets its initial burden by using this second method, the nonmoving party may either point out to the court record evidence, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or the nonmoving party may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.  However, when responding, the nonmovant can no longer rest on mere allegations, but must set forth

4

evidence of specific facts.  *Lewis v. Casey*, 518 U.S. 343, 358 (1996) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)).

## II.      RELEVANT FACTS[1]

### A.      Plaintiff's Employment with Defendant

On June 15, 2004, Plaintiff, an African-American individual, submitted his first application for employment with Defendant, a construction company, where he applied for a position on the asphalt crew and as a laborer.  (Docs. # 32-1 at 18 and # 32-2 at 44).  Plaintiff's employment application provided that he had experience in "curbs and gutters," "cement, asphalt, pipe and base laying experience," and "grading experiences." (Doc. # 32-2 at 45–46).  Additionally, his application listed that he had "worked on an asphalt crew and pipe crew" in 1996 for another construction company, H.N. Donahoo.  (*Id*. at 45).  In Plaintiff's deposition, however, he stated that his most recent job prior to working for Defendant was at Donahoo, a construction company, which was Plaintiff's only construction experience before working for Defendant. (Doc. # 32-1 at 13).  Plaintiff worked at Donahoo for "a month or two," where he spent some time on a road construction crew. (*Id*. at 13–14).  Despite the conflicting information in Plaintiff's application, the parties' understand Plaintiff's first stint in construction to be the month or two prior to June 15, 2004 that he spent working for Donahoo, and that in his deposition he clarified the scope of his prior experience.

---

[1] The facts presented are undisputed, unless the court notes otherwise.  When the facts are in dispute, they are stated in the manner most favorable to Plaintiff.  *See Chapman*, 229 F.3d at 1023.  The analysis of the issues related to this motion has been made more challenging than usual owing to several factors, including but not limited to: (a) the voluminous record submissions by the parties; and (b) the parties' "characterizations" of the facts. In particular, the court has been frustrated by the manner in which the parties have presented the facts and purported factual disputes.  For instance, Plaintiff improperly labeled his personal opinions, arguments, and inferences as "facts."  Additionally, Plaintiff's list of additional undisputed facts did not comply with the Uniform Initial Order (Doc. # 6 at 17), because it contained facts that had already been referenced in Defendant's statement of facts.  Although these shortcomings may not appear to be particularly problematic in a vacuum, they make the court's Rule 56 analysis more difficult.

On June 23, 2004, Billy Joe Nichols, the General Superintendent for Defendant, hired Plaintiff as a laborer on an asphalt crew. (Docs. # 32-1 at 18; # 32-4 at 4, 6; and # 32-12 at 44). Plaintiff commenced working for Defendant by shoveling asphalt on the road paving crew and later "ran the power broom, screed, rake, shovel, . . . operated a little bit of paving . . . and ran the, little bit, back-up roller." (Doc. # 32-1 at 18, 49). Plaintiff also trained employees on the shovel and the rake. (*Id*. at 49). Sometime in 2006, Plaintiff asked his supervisor to allow him to take vacation days to attend an interview with Hyundai, but his supervisor denied his request. (*Id*. at 19). Plaintiff voluntarily left his job with Defendant in 2006, shortly after the Hyundai incident.[2] (*Id*.) Before Plaintiff left his job, he had been operating the screed, a part of a paving machine that controls the amount of asphalt poured. (*Id*. at 49; Doc. # 32-4 at 16).

On August 6, 2006, Plaintiff applied to work for Defendant again and listed "rakeman" as the position for which he was applying.[3] (Docs. # 32-1 at 19 and # 32-2 at 51). Plaintiff's 2006 employment application listed his previous job responsibilities with Defendant, including that he had raked, shoveled, and operated the screw,[4] and under "Skills and Qualifications," Plaintiff stated that he had served as a rakeman and power broom operator, had trained as a screed operator, and that he "underst[ood] the basic concept of paving." (Doc. # 32-2 at 52–53). On August 15, 2006,

---

[2] In his deposition and EEOC charge (Docs. # 32-1 at 19 and # 32-2 at 48), Plaintiff states that he left his job with Defendant in May, but Defendant's records (Doc. # 32-2 at 50) indicate that he left in February. The exact month in which Plaintiff left his job with Defendant is irrelevant because what is clear is that Plaintiff left his job before he applied to work for Defendant for a second time in July 2006.

[3] A rakeman is "basically like a finisher." (Doc. # 32-1 at 20). When there are "bad spots" in the asphalt, the spot is dug out and the shovelman pours asphalt in that spot. (*Id*.) The rakeman is responsible for smoothing asphalt and raking the joints. (*Id*.)

[4] In Anthony Shane Camp's deposition, Camp explained that the "screed is the back of the paver. The screw is what operates it." (Doc. # 32-15 at 8).

6

Defendant rehired Plaintiff.  (*Id*. at 55).  Plaintiff's claims in this lawsuit are based on events that occurred during Plaintiff's second term of employment with Defendant.

During his second term of employment with Defendant, Plaintiff performed many different tasks and served in several different roles.  Plaintiff worked primarily on the screed and occasionally worked the rake.[5]  (Doc. # 32-1 at 21).  He performed well as a screed operator and was never disciplined by Defendant for poor performance.  (*Id*.)  Additionally, he performed certain duties that were generally performed by the foreman, such as figuring out how much asphalt was needed for a job by taking measurements to determine the rate the asphalt would be laid on a job.  (*Id*. at 49–50).  Further, he took measurements to determine if the crew was getting all of the useable asphalt out of a truck and to determine whether the screed was high or low.  (*Id*. at 49).  He also ran the electronics for a job and trained employees on the shovel, rake, screed, and roller.  (*Id*.)  Plaintiff also testified that during his second term of employment with Defendant, in addition to other tasks, he performed all of the same job duties he performed while working for Defendant during his first term of employment.  (*Id*.)  In sum, despite being initially classified as a rakeman and later classified as a screed operator, Plaintiff primarily operated the screed but also served in various other roles on the asphalt crew.

Oscar Wayne Snell, a superintendent of Defendant, supervised Plaintiff, personally observed Plaintiff's work, and testified that Plaintiff was a good screed operator, one of the best he had ever

---

[5] Plaintiff asserts that it is undisputed that he was rehired as a screed operator (Doc. # 35 at 24), but the Rule 56 record facts do not support this assertion.  Defendant's records indicate that Plaintiff was initially classified as a rakeman, (Doc. # 32-3 at 38), and Plaintiff's application stated he was applying for a rakeman position in his application (Doc. # 32-2 at 51).  Further, Plaintiff testified that he performed numerous types of jobs for Defendant in addition to operating the screed.  (Doc. # 32-1 at 49–50).  The deposition page to which Plaintiff cites for support reveals that he worked as a screed operator, but not that he was hired to operate the screed.  (*Id*. at 21).  Overall, the Rule 56 facts do not support Plaintiff's assertion and it is unclear what Plaintiff was hired to do in 2006.  Indeed, the facts suggest that Plaintiff was hired to do rakeman work.

seen.  (Doc. # 32-11 at 12–13).  Snell testified that he had no criticism of Plaintiff's work performance.  (*Id*. at 14).

## B.      Defendant's Compensation Policies and Pay Charts

Nichols testified that Defendant paid its employees within a particular pay range for their job classification, and that for pay purposes, Defendant considered what other employees were being paid and the employee's experience.[6]  (Doc. # 32-4 at 25–26).  Nichols stated that seniority could also be factored in to an employee's pay rate.  (*Id*. at 25).

Nichols testified that the most skilled job on an asphalt crew was a paver operator, and the other jobs on an asphalt crew were ranked as follows, in order from most skilled to least skilled jobs: roller operator, screed operator, raker, grader.  (Doc. # 32-4 at 23).  Nichols testified that as Defendant's General Superintendent during some of Plaintiff's employment, he had some input in setting the employees' pay rates, as did the foremen.  (*Id*. at 15–16, 27–28).  Snell similarly testified that Nichols and the foremen had input in the pay rates of the screed operators and that they would make a recommendation on the employees' pay rates to Harry Thomas, Defendant's Vice President of Operations.  (Doc. # 32-11 at 16); (*see* Doc. # 32-12 at 24) (Thomas testified that Nichols and the foremen would make a recommendation about a screed operator's pay rate "from the field").  The

---

[6] Plaintiff disputes Nichols' testimony and the manner in which Defendant determined the pay of its employees. Plaintiff points to his deposition as evidence, in which he stated that he worked as a screed operator but was paid as a rakeman, and opined that he should have been paid as a screed operator.  (Doc. # 32-1 at 21, 51).  Further, Plaintiff points to his deposition testimony which indicates he believed that Anthony Shane Camp did not have any experience operating the screed, and though he was paid as a screed operator, he did not deserve that pay rate.  (*Id*. at 50).  Plaintiff argues that this deposition testimony shows that Defendant could not have based employees' pay on experience because of the discrepancies between Plaintiff's and Camp's pay rates and experiences.  However, outside of his own opinions regarding what Camp should have been paid, Plaintiff has no personal knowledge of how Defendant paid its employees and has not pointed to any specific facts that call Nichols' deposition testimony into doubt.  Again, Plaintiff merely relies on his personal opinion as stated in his deposition.  Accordingly, Plaintiff has not presented a dispute.

8

testimony in the record makes it clear that a foreman had some input in the pay rates of the employees he supervised.[7]

Below is a chart compiling information from Defendant's records, titled "2007 Hourly Pay Increases by Job Type: Asphalt Screed Operators", showing which employees were classified as screed operators in 2007, the increase in the employee's pay rate in 2007, and the race of the employee:

| Name | Previous Position | New Job Position (if any) | 2006 Pay Rate | 2007 Pay Rate | Race |
|---|---|---|---|---|---|
| Terry Lide | screed[8] | | 14.05 | 14.55 | African-American |
| Michael Luster | screed | | 12.00 | 13.00 | Caucasian |
| Matthew Albright | screed | | 12.50 | 12.95 | Caucasian |
| Bryan Pilkington | screed | | 12.20 | 12.55 | Caucasian |
| Stanley Conley | screed | | 10.70 | 11.50 | Caucasian |
| Jason Evans | screed | | 11.00 | 11.40 | Caucasian |

---

[7] Plaintiff disputes the fact that Nichols set employees' pay with his foremen's input. Ironically, to show this is in dispute, Plaintiff pointed to testimony where Nichols stated that he and his foremen have input in setting the employees' pay rates. (Doc. # 35 at 7–8). Further, Plaintiff presented Nichols' deposition from February 19, 2010 in *Blue v. Dunn Construction Company, Inc.*, No. 09-864 (N.D. Ala. Aug. 16, 2010) (Judge Acker), *aff'd by* No. 10-14345 (11th Cir. Nov. 23, 2010), where Nichols stated that although the foremen had some input in the employees' pay, the ultimate decision rested with Nichols and Harry Thomas, the Vice President of Operations. (Doc. # 36-3 at 102). This deposition testimony does not controvert the fact that Nichols and the foremen had <u>some</u> input in setting employees' pay rates. Plaintiff has failed to present specific, contrary evidence to create a dispute.

[8] The court has used the term "screed" throughout this chart to refer to a screed operator position.

| _Keith Davis_ | rakeman | screed[9] | 10.15 | 11.00 | African-American |
|---|---|---|---|---|---|
| John Turner | screed | | 9.30 | 11.00 | African-American |
| Martiel Smith | labor | screed | 10.15 | 10.90 | African-American |
| Chadwick Brand | SKLABR[10] | screed | 9.35 | 10.90 | African-American |
| Steven McCurry | screed | | 10.00 | 10.90 | African-American |
| Dmitri Jackson | SKLABR | screed | 9.50 | 10.50 | African-American |

(Doc. # 32-12 at 35–37).

In 2007, Plaintiff was paid less than all five of the Caucasian screed operators and one African-American screed operator, Terry Lide.  Lide, who had been hired in 1997, had been working for Defendant the longest out of all of the screed operators and was paid the most out of all the screed operators.  (Doc. # 32-12 at 37–38).  Plaintiff was paid the same as one other African-American screed operator and more than four other African-American screed operators.

Below is a chart compiling information from Defendant's records, titled "2008 Hourly Pay Increases by Job Type: Asphalt Screed Operators," listing the screed operators' pay rates in 2008, their 2007 pay rate, and their race:

---

[9] Defendant's records reveal that during Plaintiff's second term of employment with Defendant, Plaintiff was initially classified and paid as a rake laborer, at an hourly rate of $10.15.  (Doc. # 32-12 at 35–36).  In 2007, Defendant changed Plaintiff's job classification from rakeman to screed operator, and simultaneously increased Plaintiff's hourly pay rate from $10.15 to $11.00.  (Doc. # 32-12 at 35–37).  Defendant asserts that by reclassifying Plaintiff it promoted him.  Plaintiff disputes that he was promoted to screed operator because, he asserts, he had already been working as a screed operator.  Resolving this dispute in Plaintiff's favor, the court does not construe this reclassification as a promotion.

[10] "SKLABR" has not been defined in the record, though the court assumes it stands for "skilled laborer."

| Screed Operator[11] | 2007 Pay Rate | 2008 Pay Rate | Race |
|---|---|---|---|
| Terry Lide | 14.55 | 14.55 | African-American |
| Anthony Shane Camp | 14.00 | 14.00 | Caucasian |
| Matthew Albright | 12.95 | 13.65 | Caucasian |
| Michael Luster | 13.00 | 13.45 | Caucasian |
| Bryan Pilkington | 12.55 | 13.00 | Caucasian |
| Stanley Conley | 11.50 | 12.50 | Caucasian |
| Martiel Smith | 10.90 | 11.90 | African-American |
| Jason Evans | 11.40 | 11.80 | Caucasian |
| Tracey Moore | 11.25 | 11.65 | African-American |
| Sammy Blankenship | 10.30 | 11.50 | Caucasian |
| John Turner | 11.00 | 11.40 | African-American |
| Steven McCurry | 10.90 | 11.30 | African-American |
| *Keith Davis* | 11.00 | 11.25 | African-American |
| Justin Williamson | 10.00 | 11.00 | Caucasian |
| Demarcus Cotton | 9.00 | 10.50 | African-American |

(Doc. # 32-12 at 35–38). Defendant's records demonstrate that in 2008, Plaintiff's pay rate of $11.00 per hour was increased to $11.25 per hour. (Doc. # 32-12 at 36, 38). Lide still earned the highest pay rate out of all the screed operators. Including Lide, five African-American screed operators were paid more than Plaintiff, and seven Caucasian screed operators were paid more than Plaintiff.

---

[11] All of the employees listed were previously classified as screed operators, except for Justin Williamson and Demarcus Cotton. Williamson's job classification changed in 2008 from "SKLABR" to screed operator and Cotton's job classification changed in 2008 from "LABOR" to screed operator.

All the employees on the 2007 and 2008 charts were evaluated by Nichols.  (Doc. # 32-12 at 37–38).  The charts list which foreman was assigned to each employee, and there are several different foremen assigned to different employees.[12]  (*Id*.)  Plaintiff was assigned to foreman Bill Yekel in 2007 and Tim Fallon in 2008.  (*Id*.)  Defendant's records contain what appears to be a range of pay rates for screed operators; there are two columns, titled "Low Range" and "High Range," and the range remained the same for each employee.  (Doc. # 32-12 at 37–38).  Additionally, the date each employee was hired is listed.  (*Id*.)  Further, Defendant's records list what the employee's pay rate would be if it were increased by three and a half percent (3.5%), but, as explained by Nichols, the "Manager's Rate" was the employee's new pay rate.  (*Id*. at 35–38).  Neither party submitted evidence concerning how this "Manager's Rate" was determined.

## C.   Plaintiff's Alleged Comparators

Plaintiff asserts that Anthony Shane Camp, Matthew Albright, and Jason Evans, all of whom are Caucasian, are proper comparators for purposes of his discriminatory pay arguments.

### 1.   Matthew Albright

Albright had two terms of employment with Defendant, and worked for Defendant longer than Plaintiff.  (Doc. # 32-1 at 33).  Albright was hired for the second time on July 27, 2006.  (Doc. # 32-3 at 38–39).  In 2007, Albright was paid $12.95 per hour, and in 2008, his pay rate was increased to $13.65 per hour.[13] (Doc. # 32-12 at 35–38). Albright's 2006 application for employment

---

[12] The two charts created by the court do not reflect all of the information from Defendant's charts.  Any information from Defendant's records not contained in the court's charts that are important to this case will be referenced elsewhere.

[13] Plaintiff has no personal knowledge on how to read Defendant's charts and, disregarding Nichols' testimony about these charts, has misinterpreted Defendant's records.  (*See* Doc. # 32-12 at 35–36).  Nichols explained that the 2007 chart shows what the employee's pay rate was in 2006 and what it was increased to in 2007.  Plaintiff has incorrectly read the chart as indicating that Albright was paid $12.50 per hour in 2007 (which was actually Albright's

with Defendant provides that he had worked for Defendant sometime from 1998-2001, and had worked for another construction company, Richard & Sons, from 2001-2006.[14] (Doc. # 32-8 at 43–44). In sum, Albright's application indicated that he had about eight years of construction experience before working for Defendant in 2006. Further, Albright's application revealed that he had worked as a base loader operator for Defendant from 1998 to 2001, and that he had experience as a foreman, on the pipe, as a grade work operator, and with the track hoe, rubber tire, hoe, track loader, and dozer. (*Id*. at 44). When Albright was hired in 2006 for what would be his second term of employment with Defendant, Albright was classified as a screed operator, (Doc. # 32-3 at 38–39), and operated the paver (Doc. # 32-1 at 32–33).[15] Nichols testified that Albright was paid more than Plaintiff because of his experience and because he operated the paver, which warranted higher pay than that of a screed operator. (Doc. # 32-4 at 48).

---

hourly rate for 2006) and that his 2008 hourly rate was $12.95 (which was actually his pay rate for 2007).

[14] Defendant characterizes Albright's employment history, as described in his 2006 application, as having experience in construction for the past eight years. (Docs. # 47 at 25 and # 32-8 at 44). The writing on the application is difficult to decipher; specifically, the court cannot determine the year that Albright began working at Richard & Sons. (Doc. # 32-8 at 44). Defendant asserts that Albright had eight years of construction experience in 2006, demonstrating that Defendant has read Albright's application as stating that he began working for Richard & Sons around 2001. (Doc. # 31 at 7). Although Plaintiff "disputes" this, Plaintiff does not specifically address the years in which Albright worked in construction before working for Defendant. (Doc. # 35 at 11). While "disputing" Defendant's assertion, Plaintiff merely states that Albright did not have experience "working on an asphalt crew and could not operate the screed," citing his own deposition testimony for support. (*Id*.) But, Plaintiff's statement in his deposition does not controvert Defendant's assertion that Albright's application shows that Albright had worked construction jobs for the previous eight years. To further establish this "dispute," Plaintiff tangentially discusses an incident where Albright was allegedly terminated for assaulting an African-American employee. Once again, this assertion does not controvert Defendant's characterization of Albright's construction experience. Accordingly, the court does not view the amount of years of construction experience that Albright had in 2006 to be a disputed fact. The court construes Albright's application as reflecting that Albright began working for Richard & Sons in 2001 and therefore, when combined with other experience, had about eight years of construction experience in 2006.

[15] The paver is the vehicle to which the screed is attached. (Doc. # 32-1 at 32–33).

2.        **Anthony Shane Camp**

Anthony Shane Camp began working for Defendant on October 11, 2007.  (Doc. # 32-15 at 14).  Camp was hired by Defendant as a screed operator at a rate of $14.00 an hour.  (*Id*. at 16).  Nichols had hired Camp on behalf of Defendant and approved his hourly rate.  (*Id*. at 24).  During the one year that Camp worked for Defendant, Camp operated equipment, including the screw, and backhoe, but not the paver.  (Doc. # 32-15 at 7).  During this year, Camp did not work for three months because of a shoulder injury.  (*Id*.)

Plaintiff trained Camp on how to run the screed, particularly on how to raise and lower the screed.  (Docs. # 32-1 at 50 and # 32-15 at 17).  Snell remembered Camp working as a roller operator, not as a screed operator, on his projects.  (Doc. # 32-11 at 14).  Notwithstanding Snell's recollection, Camp must have operated the screed at some point since Plaintiff trained him on how to operate it.  (*See* Docs. # 32-1 at 50 and # 32-15 at 17).

Defendant paid Camp at a higher rate than Plaintiff based on Defendant's understanding of Camp's experience, which was gleaned from Camp's employment application, Camp's interview with Nichols, and possibly an interview with the human resources department.  (Doc. # 32-4 at 41–42, 45).  Camp's employment application with Defendant listed experience working in asphalt, though it did not list specific experience as a screed operator.  (Doc. # 36-8 at 3–4).  Camp's application provided that while working at three different companies for a period of over six years, he had gained experience in placing asphalt, keeping up with quantities, testing roadways, asphalt densities, dirt densities, concrete testing, and testing "hot mix asphalt production & on the highway as the mat is being placed," and his job titles were "Paving Supervisor / Lab Tech / Roadway," "Geotechnical Engineer," and "Lab Tech / Quality Control."  (Doc. # 32-7 at 9).  Further, Camp

stated on his application that he could "operate many different types of equipment for paving crew when testing is required" and that he had "certification in both lab & roadway." (*Id*. at 9–10). Nichols testified that when he interviewed Camp, Camp said that he knew how to operate the screed, but did not specify how many years of experience he had operating a screed. (Doc. # 32-4 at 43–44). Ninety-five percent of Camp's experience working with asphalt had been in the lab testing the asphalt.[16] (Doc. # 32-15 at 9).

In Defendant's response to Plaintiff's EEOC charge, it states that when Camp began working for Defendant, Camp had about twelve years of prior experience laying asphalt. (Doc. # 38-5 at 3). Plaintiff asserts that Camp testified in his deposition that this was not true. (Doc. # 32-15 at 21). Defendant disputes this, citing the deposition text. (Doc. # 47 at 20). The deposition text reveals a disagreement (or miscommunication) between Plaintiff's lawyer, Larry R. Mann, and Camp, over whether Camp had twelve years of experience in asphalt, and whether there is a difference between experience "in asphalt" and experience "laying asphalt." (*Id*. at 21–22). On Camp's employment application, he reported six and a half years of experience working in asphalt, much of which was

---

[16] Plaintiff claims, without providing specific evidence, that there is a dispute as to several facts found in this paragraph, such as how Defendant determined Camp's hourly pay rate, how much experience Camp had and what this experience meant, what Camp's employment application showed, and what Camp told Nichols during his job interview. Much of this involves Plaintiff's interpretation of the facts and Defendant's reasons for determining pay, which are not properly discussed in the facts section. Plaintiff has not presented any evidence that controverts the fact that Defendant determined Camp's pay rate based on its understanding of Camp's experience at the time Camp was hired. Plaintiff challenges this fact by asserting that Camp did not have any experience operating the screed, pointing to the lack of screed operator experience in Camp's employment application, the fact that most of Camp's experience was in the lab, and Plaintiff's personal opinion. However, Camp's lab experience and the lack of screed experience in his application do not disprove the fact that Defendant considered Camp's employment application and interview statements when determining his pay. Any assertion by Plaintiff contesting whether Camp actually had the screed operator experience that he told Nichols he had is Plaintiff's mere personal opinion unsupported by any evidence. Moreover, whether Camp exaggerated or lied about his experience does not change the fact that Defendant took Camp's statements and his application into consideration when determining his pay. The undisputed fact is how Defendant determined the rate at which it would pay Camp, not whether Defendant's understanding of Camp's experience turned out to be accurate. In sum, Defendant and the court have described Camp's application as is, and it is therefore undisputed that Defendant paid Camp based on its understanding of his experience. Plaintiff has once again inaccurately represented to the court that there is a dispute of a material fact by couching his beliefs as "facts."

performing lab work.  (*Id*.)  Although Camp testified that he does not know where Defendant came up with the idea that he had twelve years of experience, Camp also testified that "yeah, [he had] been in asphalt for twelve years."  (*Id*.)  Accordingly, given Camp's inconsistent testimony, it is disputed whether Camp had twelve years of experience and whether his experience involved *laying* asphalt. The court construes Camp's experience as it was presented in his employment application, wherein he reported over six years of experience in asphalt.

### 3.       Jason Evans

Defendant hired Jason Evans, Caucasian, on August 8, 2006.  (Doc. # 32-12 at 37–38). Defendant classified Evans as a screed operator.  (*Id*.)  Evans was paid $11.00 per hour in 2006, and his pay rate was increased to $11.40 per hour in 2007.[17]  (*Id*.)  In 2008, Evans' pay rate was increased to $11.80 per hour.  (*Id*. at 35-38).[18]

### D.       Plaintiff's Pay and Complaints Regarding his Leadman and Foreman Work

A leadman acts like an assistant foreman, and fills in for the foreman when the foreman leaves the job site, is unavailable, or is in the truck.  (Doc. # 32-1 at 30–31).  In the absence of a foreman, a leadman is supposed to communicate with the job superintendent to learn what needs to be completed and then convey this information to the rest of the crew.  (*Id*. at 31–32).  At times, Plaintiff filled in for the leadman and foreman, such as when the foreman had to leave the job site. (*Id*. at 30–31).  Plaintiff was never told to perform the leadman or foreman's duties, but voluntarily

---

[17] Plaintiff has misinterpreted Defendant's records.  (*See* Doc. # 32-12 at 35–36); *supra* n.13.  Although Nichols explained that the 2007 Hourly Pay Increases chart shows what the employee's previous pay rate was in 2006 and what it was increased to in 2007, Plaintiff has incorrectly read the chart as indicating that Camp as paid $11.00 per hour in 2007, which was actually Camp's hourly rate for 2006.

[18] Plaintiff has again misinterpreted Defendant's records.  *See supra* n.13.  Defendant's 2008 Hourly Pay Increases chart demonstrates that Camp's pay rate was increased from $11.40 per hour in 2007 to $11.80 in 2008.

"assumed that role because no one else knew [what to do]." (*Id*. at 31). In addition to occasionally performing foreman duties, Plaintiff filled in for the foreman for a full shift (over a full day) for about four days, although he was never told that he was the foreman for a full shift. (*Id*. at 37).

Plaintiff was never promoted to a leadman or foreman position while working for Defendant. (*Id*. at 31). He never saw any posting about an opening for a foreman or leadman position, and was never told about an open leadman or foreman position. (*Id*. at 51). Further, Plaintiff never received foreman or leadman pay. (*Id*. at 5). Caucasian employees, such as Albright, have also performed leadman duties without receiving additional pay.[19] (*Id*. at 31–32).

However, Defendant's employees who temporarily perform leadman or foreman duties do not receive additional compensation for performing these duties. (Docs. # 32-4 at 22 and # 32-12 at 34). Additionally, Defendant generally does not formally recognize a leadman position for pay purposes and does not provide additional compensation for employees who work in that capacity. (Docs. # 32-4 at 22 and # 32-12 at 34). Nichols testified that the only exception to Defendant not recognizing leadman as a formal position has been on the rare occasion "when Defendant has identified an employee who it believes has strong promise to eventually become a Foreman and has assigned such employee to lead a crew that has no Foreman at all. These employees, who permanently lead a Foreman-less crew though they have not yet been promoted to Foreman, are

---

[19] Plaintiff disputes this point, referring the court to page 196 in his deposition. The testimony on that page, however, does not support Plaintiff's assertion. It seems Plaintiff may have intended to refer to page 123 of his deposition, where he stated that he saw Albright's paycheck and Albright was paid more than he was paid. (Doc. # 32-1 at 33). Notably, Plaintiff did not state in his deposition that Albright was paid more than he *because* Albright performed leadman duties; he merely stated that Albright was paid more than he was. (*See id*.) There is no evidence in the record, nor has Plaintiff pointed to any evidence, that shows that Albright was paid more because he performed leadman duties. Accordingly, inasmuch as Plaintiff has not pointed to any specific facts to controvert the assertion that Caucasian employees have served as leadman without receiving additional pay, the court views this fact as undisputed.

sometimes called 'Leadman.'"[20] (Doc. # 32-12 at 34–35).  Nichols stated in his declaration that the only employee he could recall that was considered such a leadman was Wiley Gibson, an African-American employee.  (*Id*. at 35).

Plaintiff complained to his foremen, Yekel and Fallon, as well as Nichols about his pay. (Doc. # 32-1 at 33–34).  He complained to Yekel several times (possibly more than five times).  (*Id*. at 34).  When Plaintiff told Yekel that he needed to be paid more, Yekel said that he understood and told Plaintiff he would get him a raise.  (*Id*.)  When Plaintiff complained to Fallon about his pay, Fallon told Plaintiff he had already "told them" that Plaintiff needed a raise and did not know what else to tell them.  (*Id*.)  Plaintiff asked Fallon for permission to speak to Nichols about his pay and Fallon said that it was fine with him.  (*Id*.)  Plaintiff complained to Nichols twice about his pay, and said that if he were going to be paid as a rakeman, he would perform the duties of a rakeman rather than those of a screed operator without getting screed pay.  (*Id*.)  Additionally, Plaintiff told Nichols he deserved to be paid more, and Nichols responded that he "was going to do like [he] was told to do."  (*Id*.)

Albright also temporarily served as leadman, (Docs. # 32-4 at 23 and # 32-1 at 32), and while serving as leadman on one project, Plaintiff testified that the superintendent, Snell, treated Plaintiff

---

[20] Plaintiff disputes that there is no official leadman position and that employees do not receive additional compensation for acting as a leadman.  Plaintiff has submitted a "payroll rate adjustment/increase" form from 2008 showing that Michael Wallace received a pay increase when his "Mill Operator" position was changed to "Job Foreman Ass[istan]t."  (Doc. # 38-3 at 2).  Plaintiff asserts that Wallace is Caucasian.  The document indicates that Wallace was promoted to a permanent position as a foreman assistant.  However, this document does not controvert Nichols' testimony that employees *temporarily* serving as leadman or foreman do not receive additional compensation.  Further, Plaintiff admitted in his deposition that he is not sure whether employees who function as leadmen are paid more.  (Doc. # 32-1 at 33).  The evidence concerning Wallace's job position does not create a dispute; it corroborates the fact that under certain (and apparently unique) circumstances, Defendant has permanently assigned an employee to a leadman or foreman's assistant position.

as if he were the leadman.  (Doc. # 32-1 at 32).  Plaintiff complained to Snell about Albright being appointed to the leadman position over him.  (*Id*. at 51–52).

### E.    Defendant's Policy Against Harassment and Discrimination

Defendant has a written policy prohibiting harassment and other discrimination in its workplace.  (Doc. # 32-3 at 18–32).  Defendant's policy directs employees to report harassment and other discrimination to their "supervisor and Dunn's Equal Opportunity Officer" (Docs. # 32-2 at 59 and # 32-3 at 1), who during Plaintiff's second term of employment with Defendant was William "Butch" Hopper.  (Doc. # 32-12 at 40).  Defendant's policy prohibits retaliation and provides that the company will investigate and, where necessary, remediate workplace discrimination.  (Doc. # 32-3 at 1).  On August 15, 2006, Plaintiff received a copy of Defendant's employee handbook, which contained this policy.  (Docs. # 32-1 at 20–21 and # 32-3 at 55).

### F.    The Racial Comment Incident

Plaintiff alleges that Camp, a Caucasian coworker, made one racist comment to another African-American coworker, Carlos Treadwell, outside of work.  (Doc. # 32-1 at 23–25).  Plaintiff did not personally observe or hear the conversation in which Camp allegedly made that racist comment to Treadwell, but testified that Treadwell told him that Camp had invited Treadwell to his house, and after Treadwell had called Camp several times for directions, Camp called Treadwell the "n" word and told him to "stop bugging him" and find the house.[21]  (*Id*. at 23)  Treadwell told Plaintiff that he responded to Camp by threatening to "beat [his] white [ass]."  (*Id*. at 28–29).

---

[21] It is not clear when Treadwell informed Plaintiff that Camp called Treadwell a racial slur.  Plaintiff asserts it occurred right before he resigned in August 2008 (Doc. # 35 at 26), but Plaintiff reported this incident to the EEOC on July 9, 2008 (Doc. # 32-3 at 48).  Thus Treadwell must have told Plaintiff some time before July 9, 2008.

Treadwell informed Plaintiff about this incident while they were at work and Plaintiff was training Camp on how to run the screed.  (*Id*. at 23–24).

After Plaintiff learned about this encounter, Plaintiff confronted Camp at work about the racial slur.  (*Id*. at 28).  Camp told Plaintiff that "it slipped out."  (*Id*.)  Plaintiff reported Camp's use of the racial slur to Tim Fallon, Plaintiff's foreman in 2008, who had heard and witnessed Plaintiff's conversation with Camp.[22]  (*Id*. at 28, 30).  Fallon told Plaintiff that he went into the office and "told them" about Camp's use of the racial slur.  (*Id*. at 30).  Plaintiff did not report the slur to Hopper, Defendant's Equal Employment Opportunity Officer.  (Doc. # 32-12 at 40).  No one in a supervisory or management position ever spoke with Plaintiff about the Camp and Treadwell incident.  (Doc. # 32-1 at 30).  Camp was never disciplined for calling Treadwell a racial slur outside of work.[23] (Doc. # 32-7 at 8–42).

Aside from Camp's statement to Treadwell, Plaintiff is not aware of any other Caucasian employee using the "n" word or making other racially derogatory comments.  (Doc. # 32-1 at 26).  Plaintiff had heard some of Defendant's African-American employees use a variation of the "n" word, but because this term was used by African-Americans, Plaintiff believed that their use of the term was not derogatory and that he had no reason to report this use.  (*Id*. at 26–28).  Plaintiff testified that he told his crew not to use the "n" word.  (*Id*. at 25).

---

[22] Fallon has also been referred to as "Fallin" throughout the record.  Both variations of the name refer to the same person.

[23] To support this fact, Plaintiff relies on the absence of any disciplinary record of this incident in Camp's personnel file.  Defendant disputes this, stating that there is no evidence showing that Camp was never disciplined for this conduct.  Further, Defendant asserts that Camp could have been verbally reprimanded since Snell testified that he verbally told employees to stop using the "n" word but could not recall which employees he spoke to about this racial slur.  (Doc. # 32-11 at 15).  Construing this dispute in the light most favorable to Plaintiff, and noting that there is no record evidence demonstrating that Camp was ever disciplined for the racial slur, for the purposes of its Rule 56 ruling the court assumes that Camp was not disciplined for calling Treadwell a racial slur outside of work.

Camp testified that the "n" word was commonly used by employees on the paving crew while he was working for Defendant, but that he had only heard African-American employees use that word. (Doc. # 32-15 at 18–19). Snell, who is African-American, testified that he heard African-American employees use this racial slur on the job site and that this use of the word offended him. (Doc. # 32-11 at 4, 15). Snell testified that any employee who used this racial slur in the workplace, regardless of race, violated Defendant's policies. (*Id*. at 15). Snell never reported any employees for saying the "n" word in the workplace, but he did tell employees not to use that word anymore. (*Id*.)

### G.    Retaliation

Plaintiff testified that he complained to Fallon and Nichols about his pay, telling them that he thought he deserved to be paid more, and should be paid as a screed operator rather than a rakeman since he functioned as a screed operator. (Doc. # 32-1 at 33–34). Plaintiff alleged that Nichols often made comments to him, and Plaintiff was always outspoken and defended himself. (*Id*. at 37–38). For example, Plaintiff stated that Nichols told only him to button his shirt before work in the morning, even though all of the employees were required to button their shirts but never did, and Plaintiff defended himself to Nichols. (*Id*. at 37). When asked in his deposition whether Nichols ever told any other employee to button his shirt, however, Plaintiff testified that he "couldn't tell you." (*Id*. at 38). Further, Nichols made comments to and questioned Plaintiff when he walked through the office to get supplies, such as "what you doing in here" and "[Y]ou getting all the towels, you getting too many, put some of them back." (*Id*. at 37–38). Plaintiff stated that he "never heard" other employees get questioned while getting supplies, and that he was known on his crew as the only one who got "bother[ed]" when getting supplies. (*Id*. at 38).

21

Nichols testified that he instructed many employees, both Caucasian and African-American, to button their shirts while working, and similarly questioned employees of all races about why they were in the supply area. (Doc. # 32-12 at 35). Nichols' testimony conflicts with Plaintiff's statements from his deposition, though Plaintiff's statements are somewhat inconsistent. Nonetheless, the court concludes that it is disputed as to whether Nichols only questioned Plaintiff about getting supplies and only instructed Plaintiff to button his shirt, and therefore, viewing the facts in the light most favorable to Plaintiff, the court assumes for summary judgment purposes that Nichols only told Plaintiff to button his shirt and only questioned Plaintiff when he got supplies. On the other hand, it is undisputed that in light of Plaintiff's complaints and outspokenness, Defendant never demoted Plaintiff, discharged him, or reduced his pay. (Doc. # 32-1 at 41–42). In fact, Defendant later rehired Plaintiff. (Docs. # 32-1 at 19 and # 32-3 at 38).[24]

## H.    Plaintiff's Resignation

On July 24, 2008, Plaintiff applied for employment with Wiregrass Construction, Defendant's competitor. (Doc. # 32-13 at 5–8). On August 5, 2008, Plaintiff resigned from his position with Defendant, and on the next day, began working for Wiregrass Construction at $11.25 an hour. (Docs. # 32-13 at 5 and # 32-12 at 45). Plaintiff stated that he quit primarily because Camp used the "n" word outside of work, but also partly because he did not like his pay rate with Defendant and believed Defendant treated Tim Blue, another employee, unfairly.[25] (Doc. # 32-1 at

---

[24] In Paragraph 50, Plaintiff admitted that Defendant promoted Plaintiff to a screed operator position. (Docs. # 31 at 12 and # 35 at 22). The court views this as a mistake on Plaintiff's part, since Plaintiff's view throughout his brief has been that he was never "promoted" to a screed operator position. (Doc. # 35 at 9).

[25] Plaintiff tries to dispute this, stating in his Response that he stopped working for Defendant because "he could no longer take the discrimination he was being forced to endure," and citing to pages in his deposition where he testified to that end. (Doc. # 35 at 26). However, Defendant has pointed to other areas of Plaintiff's deposition wherein he attributed his resignation to several factors. (Doc. # 47 at 17). Accordingly, there is no dispute over Plaintiff's stated

22–23, 35).  Timothy Blue is a former employee of Defendant who also asserted race discrimination claims against Defendant in the Northern District of Alabama *Blue v. Dunn Construction Company, Inc.*, No. 09-864 (N.D. Ala. Aug. 16, 2010) (Judge Acker), *aff'd by* No. 10-14345 (11th Cir. Nov. 23, 2010).  (Doc. # 32-14 at 5–23).  The court dismissed all of Blue's claims on summary judgment, and that decision was affirmed by the Eleventh Circuit.  (*Id*. at 5–35).  Although Plaintiff claimed that Defendant's working conditions were intolerable, in June 2009, Plaintiff sought to be rehired by Defendant a third time, less than a year after his second resignation.  (Docs. # 32-1 at 21–22 and # 32-3 at 33–37).

The day Plaintiff resigned, Plaintiff testified that he told Mark Williams that he was giving his two-week notice and Williams withheld Plaintiff's final paycheck.  (Doc. # 32-1 at 41).  Plaintiff stated that he told Williams he was giving his two-week notice before and after Williams announced he would not give Plaintiff his paycheck.  (*Id*.)  When Plaintiff resigned in 2006, his foremen and Nichols were aware that he felt like he was being treated unfairly.  (*Id*.)

## I.    Plaintiff's EEOC Charge[26]

Plaintiff filed a charge with the EEOC on July 9, 2008, alleging race-based discrimination and retaliation against Defendant.  (Doc. # 1 at 14–15).  Plaintiff listed the earliest date of discrimination to be January 2006 and the latest July 9, 2008, noting that the discrimination is a continuing action.  (*Id*. at 14).  Plaintiff alleged that during his second term of employment with Defendant, he worked as a screed operator but was not paid as such.  (*Id*.)  He claimed that Albright

---

reasons for resigning; the court recites Plaintiff's reasons as he conveyed them in his deposition.

[26] The court concludes that Plaintiff has satisfied the administrative remedies for all of his Title VII claims, except for the constructive discharge claim, which is discussed in Section C of Part III.

and Camp were both paid as screed operators but did not know how to operate the screed. (*Id.*)

Plaintiff asserted that he had complained to his supervisors about the "pay issue." (*Id.*) It is not clear

whether his complaint included allegations of discrimination (*i.e.*, disparate treatment due to his

race). Plaintiff also described Camp's use of the racial slur and discussed how Plaintiff functioned

as a leadman but "a white man" was recognized as the leadman and paid as such. (*Id.* at 15).

Further, he asserted that Caucasian employees are treated more favorably than he was with respect

to "pay and jobs." (*Id.*) Finally, he mentioned that he was retaliated against for complaining about

Defendant's discriminatory employment practices. (*Id.*) Plaintiff received a right to sue letter on

April 30, 2010. (Doc. # 1 at 17). Plaintiff initiated this lawsuit on July 29, 2012. (Doc. # 1).

## III.   ANALYSIS

As Plaintiff readily concedes, this is a circumstantial, not direct, evidence case. (*See* Doc.

# 35 at 46–57) (analyzing his discrimination and retaliation claims under the framework for a

circumstantial evidence case). Accordingly, Plaintiffs' discrimination and retaliation claims are

analyzed under the *McDonnell-Douglas* framework, but that model does not apply to Plaintiff's

hostile work environment and constructive discharge claims.

### A.   Claims Evaluated under the McDonnell-Douglas Framework

Because this is a circumstantial evidence case, Plaintiff's discrimination and retaliation

claims must be evaluated under the *McDonnell Douglas* burden-shifting framework. *See McDonnell*

*Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248,

252–53 (1981). The *McDonnell Douglas* framework first requires the plaintiff to establish a prima

facie case of discrimination. *McDonnell Douglas*, 411 U.S. at 802; *Burdine*, 450 U.S. at 252–53.

There are several ways in which a plaintiff may establish a prima facie case, and the method of doing

so depends largely on the particular situation in the given case. *Wilson v. B/E Aerospace, Inc.*, 376 F. 3d 1079, 1087 (11th Cir. 2004). If a plaintiff establishes a prima facie case, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for its actions. *McDonnell Douglas*, 411 U.S. at 802; *Burdine*, 450 U.S. at 253. If the employer articulates such a reason, the presumption of discrimination is eliminated and the burden shifts to the plaintiff to present evidence that the legitimate reasons proffered by the employer were pretext for discrimination. *McDonnell Douglas*, 411 U.S. at 802; *Burdine*, 450 U.S. at 253–56. To establish pretext, the plaintiff must "demonstrate that the proffered reason was not the true reason for the employment decision," and may demonstrate this either "directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Jackson v. State of Ala. State Tenure Comm'n*, 405 F. 3d 1276, 1289 (11th Cir. 2005) (quoting *Burdine*, 450 U.S. at 256). The court evaluates "whether the plaintiff has demonstrated such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could find them unworthy of credence." *Id.* (citations omitted).

Despite the burden-shifting under the *McDonnell Douglas* framework, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Wilson,* 376 F. 3d at 1088 (quoting *Burdine*, 450 U.S. at 253). A plaintiff may survive summary judgment by either showing that "intentional discrimination motivated the employer or producing sufficient evidence to allow a rational trier of fact to disbelieve the legitimate reason proffered by the employer, which permits, but does not compel, the trier of fact

to find illegal discrimination." *Wilson*, 376 F. 3d at 1088; *see Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147–48.

### 1.    Plaintiff's Disparate Pay Claim

#### a.    Prima Facie Case

##### 1)    Similarly Situated Comparator

To establish a prima facie case of disparate pay, the plaintiff must demonstrate that he held a position "similar to that of a higher paid employee who is not a member of [his] protected class." *Crawford v. Carroll*, 529 F. 3d 961, 974–75 (11th Cir. 2008) (citing *Meeks v. Computer Assocs. Int'l*, 15 F. 3d 1013, 1019 (11th Cir. 1994)). The comparator to whom the plaintiff compares himself "must be similarly situated in all relevant aspects," *Holifield v. Reno*, 115 F. 3d 1555, 1562 (11th Cir. 1997), and "must be nearly identical to the plaintiff." *Wilson*, 376 F. 3d at 1091. That is, the plaintiff's comparators must perform the same type of tasks that the plaintiff performs at work. *Cooper v. Southern Co.*, 390 F. 3d 695, 735 (11th Cir. 2004), *overruled on other grounds*, *Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 457 (2006) (per curiam). When determining whether an individual is a proper comparator to the plaintiff, courts look to the amount of years an individual has worked for the employer and the type of expertise that the individual has. *See Crawford*, 529 F. 3d at 975 (finding that the employee was not a proper comparator to plaintiff because the employee had worked for the employer "several years longer" than the plaintiff and had "specialized and highly valued expertise" that the plaintiff did not possess). Further, having different supervisors may weigh against a finding that the individuals are similarly situated. *See Jones v. Gerwens*, 874 F. 2d 1534, 1541 (11th Cir. 1989) (individuals who endured disciplinary measures undertaken by different supervisors may not be similarly situated). "If a plaintiff fails to show the existence of a similarly

26

situated employee, summary judgment is appropriate where no other evidence of discrimination is present." *Holifield*, 115 F. 3d at 1562 (citing *Mack v. Great Atl. & Pac. Tea Co.*, 871 F. 2d 179, 182 (1st Cir. 1989)); *Wilson*, 376 F. 3d at 1092.

In this case, Plaintiff compares himself to Albright, Camp, and Evans, who are each Caucasian and were paid more than Plaintiff while they were working for Defendant. Plaintiff's comparisons are off the mark, however.

First, Albright had worked for Defendant longer than Plaintiff. Albright worked for Defendant from 1998–2001 and was rehired by Defendant on July 27, 2006, while Plaintiff worked for Defendant less than two years before being rehired on August 15, 2006. Further, Albright had more construction experience than Plaintiff. Albright had about eight years of construction experience prior to working for Defendant in 2006 while Plaintiff had about two years of construction experience when Defendant rehired him in 2006. In 2006, Albright was classified as a screed operator while Plaintiff was classified as a rakeman; Plaintiff's classification changed in 2007 to screed operator. Despite their similar classifications, Plaintiff and Albright largely performed different job duties. Albright worked on the paver and Plaintiff performed various job tasks, but primarily operated the screed. Nichols stated that a paver operator was a higher skilled job than a screed operator and deserved a higher pay rate. Based on the stark differences in the amount of years Albright and Plaintiff had worked for Defendant, their different levels of construction experience, and the different types of tasks they performed for Defendant, the court concludes that Albright and Plaintiff are not "similarly situated in all relevant aspects." *See Holifield*, 115 F. 3d at 1562. Accordingly, Albright is not a proper comparator to Plaintiff for purposes of compensation.

Second, Camp began working for Defendant in 2007, about a year after Plaintiff began working for Defendant for the second time.  Camp was classified as a screed operator (as was Plaintiff in 2007), and was paid a higher hourly rate than Plaintiff.  At the time Nichols hired Camp, based on Camp's employment application and Nichol's interview of Camp, Nichols believed that Camp had over six years of experience in asphalt while Plaintiff, at this time, had about three years of experience in asphalt.  Although most of Camp's experience was in the lab, Camp had told Nichols he knew how to operate the screed and Camp's employment application listed that he had experience operating various equipment on a "paving crew when testing is required." (Doc. # 32-7 at 9–10).  Although Camp was classified as a screed operator, Camp operated the screw, roller, and backhoe in addition to operating the screed.  Plaintiff operated the screed and screw as well, in addition to performing various other tasks.  Plaintiff and Camp performed some similar tasks for Defendant and were both classified as screed operators, though Camp had about three years more experience than Plaintiff and Plaintiff seems to have performed every task on the asphalt crew. Viewing the facts in Plaintiff's favor, however, the court views Camp as a proper comparator to Plaintiff.

The Rule 56 record reveals that Evans is Caucasian, that he was hired about a year after Plaintiff was, paid at a higher rate than Plaintiff, and classified as a screed operator.  (Doc. # 32-12 at 37–38).  Plaintiff has not submitted any evidence of Evans' experience, skills, or the tasks he performed while working for Defendant.  Further, to the court's knowledge, neither party deposed Evans.  There is not enough evidence for the court to determine whether Evans was similarly situated

28

to Plaintiff.[27]   Therefore, Plaintiff has failed to present a prima facie case of disparate pay using Evans as a comparator.

Therefore, Camp is the only "comparator" Plaintiff has pointed to, but before turning to Defendant's reasons for paying Camp more them Plaintiff, the court notes the fact that there were African-American employees who were paid more than Plaintiff.  This calls Plaintiff's allegations of disparate pay into doubt.  *See Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F. 3d 639, 642 (3d Cir. 1998) (holding "that a plaintiff does not create an issue of fact merely by selectively choosing a single comparator who was allegedly treated more favorably, while ignoring a significant group of comparators who were treated equally to her"); *see also Bush v. Commonwealth Edison Co.*, 990 F. 2d 928, 931 (7th Cir. 1993), *cert. denied*, 511 U.S. 1071 (1994) (a "plaintiff cannot establish a prima facie case of racial discrimination by showing that, in a large department, a coworker of another race was treated more favorably than other coworkers of other races.  Such a pattern, in which blacks sometimes do better than whites and sometimes do worse, being random with respect to race, is not evidence of racial discrimination.")  Defendant's 2007 and 2008 pay charts reveal that the statistical evidence is not probative as to whether Defendants intentionally discriminated against Plaintiff with respect to pay because both Caucasian and African-American employees were paid more than Plaintiff.

In 2007, Terry Lide, an African-American screed operator, was paid more than Plaintiff, and in fact, was paid the most out of all the screed operators.  Lide had been working for Defendant since 1997, the longest of all the screed operators.  There is no evidence in the Rule 56 record discussing

---

[27] Moreover, after comparing the dearth of record evidence on Evans to the extensive evidence on Camp and Albright, the court does not perceive Plaintiff's assertions that Evans is a proper comparator as a bona fide argument. If Plaintiff were truly pursuing this argument, he would have at a minimum deposed Evans.

Lide's experience and (for obvious reasons) Plaintiff has not asserted that he is a proper comparator

to Plaintiff.   Of course, the fact that Lide was paid more than Plaintiff lends some support to

Defendant's argument that it did not discriminate against Plaintiff because of his race.   In addition,

once the 2008 pay raises went into effect, five African-American screed workers, Lide, Smith,

Moore, Turner, and McCurry, were paid more than Plaintiff, and Lide remained the highest-paid

screed operator.   Again, the court acknowledges that there is not enough information about these

African-American employees to determine whether they are proper comparators to Plaintiff.

However, the fact that some African-American employees were paid more than Plaintiff, and some

were paid more than other Caucasian employees, suggests that Plaintiff has only compared himself

to the employees that bolster his claims while ignoring potential comparators that would undermine

his arguments.[28]

2)      **In the Absence of a Similarly Situated Comparator Plaintiff Cannot Create a Triable Issue of Fact Based Upon Other Circumstantial Evidence**

Plaintiff argues, relying on *Smith v. Lockheed-Martin Corp.*, that if the court finds that he has

not identified proper comparators, there is still sufficient circumstantial evidence for the jury to infer

that he was discriminated against because of his race.   *See* 644 F. 3d 1321, 1327 (11th Cir. 2011).

In *Lockheed-Martin*, the Eleventh Circuit stated that "the *McDonnell Douglas* framework is not, and

---

[28] The court's analysis for disparate pay focuses on the employee's initial pay rates because the record evidence and the parties' arguments focus on employee pay rates at the time they were hired. Aside from general statements that Nichols and the foremen had input in setting the pay rate of Defendant's employees, there is scant specific evidence regarding how Defendant determined its employees' pay raises in 2007 and 2008. The record evidence reveals that in 2007 and 2008, all the employees listed were evaluated by Nichols, presumably for pay purposes, and the foreman to which each employee was assigned is listed. Plaintiff surmises that Nichols and his foreman knew he had more experience than others who were paid more than he and thus should have paid him at a higher rate, but has submitted no such evidence to support this. Accordingly, because there is an absence of specific evidence to support the argument that Plaintiff's 2007 and 2008 pay raises were based on discrimination, summary judgment is due to be granted in Defendant's favor with respect to this aspect of Plaintiff's claim.

30

never was intended to be, the *sine qua non* for a plaintiff to survive a summary judgment motion in an employment case." *Id*. at 1328. That is, a plaintiff can survive summary judgment in the absence of a comparator if he "presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent." *Id*. Such a triable issue of fact exists "if the record, viewed in the light most favorable to the plaintiff, presents 'a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker.'" *Id*. (citations omitted). In *Lockheed-Martin*, the "convincing mosaic of circumstantial evidence" was extensive: there was a documented history of disparate treatment of Caucasian and African-American employees, a spreadsheet listing the employees by name and race that the defendant's disciplinary review committee used to make discipline decisions, and a news program reporting the defendant's struggles with racism in the workplace.

Plaintiff contends that since (1) numerous employees have filed EEOC charges asserting race discrimination against Defendant, (2) Defendant allegedly ignored these charges, (3) Defendant allegedly condoned the "racially charged" atmosphere in the workplace, and (4) Defendant failed to take any action against Camp, the facts of Plaintiff's case present a "convincing mosaic of circumstantial evidence" that a jury could find amounted to discrimination. *See id*. The court disagrees. First, there is no evidence that Defendant's environment was "racially charged." Further, even if Plaintiff had made such a showing, there is no Rule 56 evidence suggesting that Defendant condoned it. Further, Plaintiff's circumstantial evidence, which includes unconfirmed, inconclusive allegations, pales in comparison to the extensive record from *Lockheed-Martin*. Plaintiff's evidence consists of (1) Timothy Blue's claims of race discrimination against Defendant, which were dismissed on summary judgment (Doc. # 32-14 at 5–23); (2) William Maddox's 2009 EEOC charge,

alleging discrimination and retaliation based on race against Defendant (Doc. # 37-8 at 2); (3) John Coleman's 2001 EEOC Charge alleging discrimination and retaliation based on race against Defendant (Doc. # 37-9 at 2–3); (4) Aristobulus "Shorty" Taylor's 2008 EEOC Charge alleging discrimination and retaliation based on race against Defendant (Doc. # 37-10 at 2-3); and (5) Sammy Dixon's sworn testimony that he complained to Nichols about Albright's racist conduct (Doc. # 37-11 at 3). Although African-American employees of Defendant have made allegations of racial discrimination and retaliation, mere allegations are not sufficient to establish that Defendant had a history of discriminating against its employees or that Defendant tolerated a racially hostile atmosphere. Accordingly, Plaintiff has not demonstrated that the evidence is extensive such that the court must look beyond the *McDonnell Douglas* framework.

### b.      Legitimate, Non-Discriminatory Reasons

The only prima facie case evidence that Defendant must respond to is the difference in pay between Camp and himself. Defendant has asserted that it hired Camp at $14.00 per hour based on its understanding of Camp's experience at the time it hired him. The court concludes that the Rule 56 evidence shows that Defendant's understanding of Camp's prior experience was in good faith and thus is a legitimate non-discriminatory reason for paying Camp at a higher pay rate than Plaintiff. *See Blount v. Ala. Co-op. Extension Serv.*, 869 F. Supp. 1543, 1551 (M.D. Ala. 1994) (experience is a legitimate non-discriminatory reason for pay differences). Because Defendant has articulated a legally sufficient reason for paying Camp more than Plaintiff, the burden now shifts to Plaintiff to establish that Defendant's reason is pretext.

### c. Pretext

To the extent Plaintiff argues that Defendant's reason for Camp's pay rate is pretext, Plaintiff seems to reiterate his opinions that because Plaintiff had more experience and was a better screed operator than Camp, Defendant's reason for paying Camp a higher rate based on his experience must be pretext. Plaintiff, however, has failed to introduce sufficient Rule 56 evidence to support his argument. As previously discussed, it is undisputed that when Camp's initial pay rate was determined, Camp's employment application and interview revealed that he had more construction experience than Plaintiff at the time the latter's initial pay rate was determined. Even if Camp successfully exaggerated his experience in his employment application and interview, as Plaintiff believes, there is no evidence suggesting that Defendant knew or should have known this or otherwise did not act in good faith. Accordingly, Plaintiffs have not presented any facts that call Defendant's legitimate, non-discriminatory reason into question.

Further, there is a legal reason that Plaintiff cannot show pretext. The Eleventh Circuit has stated that "[t]he inquiry into pretext centers upon the employer's beliefs, and not the employee's own perceptions of his performance." *Holifield*, 115 F. 3d at 1565 (citations omitted). To survive summary judgment, Plaintiff may not recast an employer's proffered nondiscriminatory reasons or substitute his business judgment for that of the employer. Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason." *Chapman v. AI Transport*, 229 F. 3d 1012, 1030 (11th Cir. 2000) (citing *Alexander v. Fulton Cnty., Ga.*, 207 F. 3d 1303, 1341 (11th Cir. 2000)). It is undisputed that at the time Defendant determined Camp's initial pay rate, Defendant had evidence that Camp was more experienced than Plaintiff.

33

Plaintiff has done nothing more than challenge the accuracy of Camp's statements about his experience and the wisdom of Defendant's decision to pay Camp more than Plaintiff, which is not sufficient to establish pretext. *See id.* Accordingly, the court finds that Plaintiff has not presented sufficient Rule 56 evidence in order to show a disputed issue of material fact concerning whether Defendant's articulated reason for paying him less than Camp was pretext for discrimination.

  **2.  Plaintiff's Disparate Treatment Claim based on Performing Leadman Work Without Receiving Leadman Pay or Recognition[29]**

   **a.  Prima Facie Case**

  To assert a prima facie case for disparate treatment in a race discrimination case, a plaintiff must demonstrate that: (1) he is a member of a protected class; (2) he was subjected to an adverse employment action; (3) his employer treated similarly situated employees outside of his protected class more favorably than he was treated; and (4) he was qualified to do the job. *Burke-Fowler v. Orange Cnty., Fla.*, 447 F. 3d 1319, 1323 (11th Cir. 2006). An adverse employment action is a "*serious and material* change in the terms, conditions, or privileges of employment. Moreover, the employee's subjective view of the significance and adversity of the employer's action is not controlling; the employment action must be materially adverse as viewed by a reasonable person in the circumstances." *Davis v. Town of Lake Park, Fla.*, 245 F. 3d 1232, 1239 (11th Cir. 2001).

  Plaintiff argues that he endured disparate treatment by not receiving leadman or foreman pay for temporarily performing these roles while other Caucasian employees were paid for performing

---

[29] The court views Plaintiff's allegations that he performed leadman work without receiving commensurate pay as part of his discrimination claim. However, because Plaintiff has alleged that Defendant discriminated against him by failing to pay him as a screed operator and failing to pay him for leadman work, the court addresses his work in these two roles separately. Further, because it is undisputed that Defendant does not pay employees additional compensation for temporarily performing leadman duties, and because Plaintiff's claim over his leadman role encompasses more than just pay, the court analyzes his allegations regarding leadman work and pay together as a disparate treatment claim.

such duties.   However, the undisputed evidence demonstrates that Defendant does not pay its employees additional compensation for temporarily performing these duties.   Moreover, although Albright was paid more than Plaintiff was and temporarily served as a leadman, there is no evidence that Albright received higher pay than Plaintiff *because* he performed these temporary duties. Indeed, the record evidence reveals that Defendant determined Albright's pay rate because of his prior experience, not because he was expected to perform leadman duties.   Plaintiff has failed to identify any of Defendant's employees that have received additional compensation for temporarily performing leadman or foreman duties.   Along with failing to establish that he suffered an adverse employment action, Plaintiff has thus failed to establish a proper comparator.

On rare occasion, Defendant concedes that it has recognized a leadman as a formal position when the Defendant anticipates that the employee will eventually become a foreman and the employee is assigned to a crew without a foreman.   The only record evidence of such an employee is Wiley Gibson, an African-American employee, and possibly Michael Wallace, a Caucasian foreman's assistant.   Although there is no further evidence on Gibson, the fact that he, as an African-American employee, was one of the exceptional employees formally promoted to leadman does not support the inference that Plaintiff's race deterred Defendant from formally recognizing him as a leadman.   Moreover, Plaintiff has not articulated the argument that he was an exceptional employee and that Defendant should have formally recognized him as a leadman.   Even if Plaintiff had argued this, Plaintiff has not set forth any evidence demonstrating that he was such an exceptional employee

35

deserving official leadman status.  Accordingly, all of Plaintiff's claims based on Defendant's failure to pay or recognize him as a leadman are due to be dismissed.[30]

### 3.    Plaintiff's Retaliation Claims

To establish a prima facie case of retaliation, the plaintiff must demonstrate that: (1) he engaged in statutorily protected activity; (2) he suffered a materially adverse employment action; and (3) there was a causal connection between the protected activity and the adverse employment action. *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68-69 (2006) (announcing "materially adverse" element); *Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001). Statutorily protected activity includes complaining to superiors of harassment or discrimination and lodging complaints with the EEOC.  *Pipkins v. City of Temple Terrace, Fla.*, 267 F. 3d 1197, 1201 (11th Cir. 2001); *see Shannon v. Bellsouth Telecomms., Inc.*, 292 F. 3d 712, 715 n.2 (11th Cir. 2002) (protected activity includes informally voiced complaints to superiors and use of internal grievance procedures).  The plaintiff "need not prove the underlying claim of discrimination which led to [his] protest," but the plaintiff must have had a "reasonable good faith belief" that he was discriminated

---

[30] The typical failure-to-promote prima facie case is as follows: (1) the plaintiff belonged to a protected class; (2) the plaintiff applied for and was qualified for a position that the employer was seeking to fill; (3) the plaintiff was rejected despite his qualifications; and (4) the position was filled with an individual outside the protected class. *Vessels v. Atl. Indep. Sch. Sys.*, 408 F. 3d 763, 768 (11th Cir. 2005) (citing *McDonnell Douglas*, 411 U.S. at 802).  If an employee does not formally announce a position, "but rather uses informal and subjective procedures to identify a candidate," the plaintiff is not required to show that he applied for the position, but rather that the employer "had some reason to consider him for the post." *Vessels*, 408 F. 3d 763, 768 (11th Cir. 2005).

    To the extent Plaintiff's claim that he was not paid as a leadman includes the argument that Defendant should have, but did not, promote him to an official leadman position, the typical failure-to-promote prima facie case does not apply here because of the way Defendant described how it came to formally recognize a leadman for pay purposes. Defendant formally recognized a leadman when the exceptional employee came around, not because of a vacancy.  To prove a claim of discrimination against Defendant under these circumstances, Plaintiff must at least establish that he was an exceptional employee and Defendant should have officially recognized him as a leadman for pay purposes.  However, due to the lack of Rule 56 evidence and argument showing why Defendant should have recognized Plaintiff as the exceptional employee, and the fact that Plaintiff's claim is due to be dismissed, the court does not view it necessary to establish the firm contours of a prima facie case for this unique situation.

against. *Holifield*, 115 F. 3d at 1566 (citations omitted).  To show his reasonable good faith belief, the plaintiff must demonstrate that he subjectively "believed that his employer was engaged in unlawful employment practices [and] that his belief was *objectively* reasonable in light of the facts and record presented." *Little v. United Techs.*, 103 F. 3d 956, 960 (11th Cir. 1997).

The Eleventh Circuit has held that "a racially derogatory remark by a co-worker, without more, does not constitute an unlawful employment practice under [] Title VI . . . and opposition to such a remark, consequently, is not statutorily protected conduct." *Little*, 103 F. 3d at 961 (concluding that one racially offensive remark by an employee was not attributable to the employer); *see Wilson v. Farley*, 203 F. App'x 239, 247 (11th Cir. 2006) (concluding that a coworker's "single derogatory remark was insufficient to serve as a basis for a discrimination charge where [the remark was made by Plaintiff's] co-worker, rather than his supervisor, and thus, [the co-worker's] conduct could not be attributed to the [employer]).

Here, Plaintiff asserts that by complaining to his foremen and the superintendent about his pay, and by complaining to his foreman about Camp's use of a racial slur, he engaged in statutorily protected activity.  First, however, the court notes there is no allegation (or evidence) that Plaintiff ever complained to his superiors that he was being paid less *because* of his race; he merely complained about his pay rate.  Complaining about his pay without alleging discrimination does not constitute engaging in statutorily protected activity.  *See Pipkins*, 267 F. 3d at 1201.  Therefore, the only possible protected activity Plaintiff engaged in while employed with Defendant was when he told his foreman Fallon about Camp's use of a racial slur outside of work to Treadwell.  On this basis, Plaintiff still cannot establish that he engaged in statutorily protected activity because Camp's

one racially offensive comment was not an unlawful employment practice, so Plaintiff's report of this comment was not statutorily protected activity. *See Little*, 103 F. 3d at 961.

Further, Plaintiff cannot establish that he had a reasonable good faith belief that Defendant discriminated against him in connection with Camp's racial slur. "Where binding precedent squarely holds that particular conduct is not an unlawful employment practice by the employer, and no decision of the [Eleventh Circuit] or of the Supreme Court has called that precedent into question or undermined its reasoning, an employee's contrary belief that the practice is unlawful is unreasonable." *Butler v. Ala. Dep't of Transp.*, 536 F. 3d 1209, 1214 (11th Cir. 2008). Because the Eleventh Circuit has held that one racially derogatory comment by a coworker is not an unlawful employment action, Plaintiff's belief that Camp's use of the racial slur was unlawful conduct on behalf of Defendant is simply not objectively reasonable. *See id*; *Little*, 103 F. 3d at 960. Accordingly, no presumption of discrimination can be created since Plaintiff cannot establish a prima face, and judgment is due to be entered in Defendant's favor on Plaintiff's retaliation claim.[31]

## B.    Hostile Work Environment

Title VII prohibits a hostile work environment in which "a series of separate acts [] collectively constitute one 'unlawful employment practice.'" *Nat'l R.R. Passenger Corp. v. Morgan*,

---

[31]  Even if Plaintiff had established that he engaged in statutorily protected activity, he did not suffer any materially adverse employment action due to his protected conduct. A materially adverse employment action is one that causes a "*serious and material* change in the terms, conditions, or privileges of employment." *Davis*, 245 F. 3d at 1239. "Moreover, the employee's subjective view of the significance and adversity of the employer's action is not controlling; the employment action must be materially adverse as viewed by a reasonable person in the circumstances." *Id*. The record does not reveal, nor does Plaintiff even suggest, what materially adverse employment action he allegedly suffered after complaining to Fallon about Camp's comment. To the extent Plaintiff refers to Nichols' comments instructing Plaintiff to button his shirt for work and asking him why he was getting supplies, there is no evidence that Nichol's comments materially altered the terms, conditions, or privileges of Plaintiff's employment. *See Davis*, 245 F. 3d at 1239. Further, Plaintiff has not asserted a causal link between the alleged protected activity involving Fallon and alleged retaliatory conduct involving Nichols, and the court refuses to speculate about what Plaintiff could (or should) have argued with respect to this element of his claim. Accordingly, even if Plaintiff could establish the first element of his prima facie case of retaliation, he cannot establish the remaining two elements.

536 U.S. 101, 117 (2002) (citing 42 U.S.C. § 2000e-5(e)(1)).   To establish a hostile work environment claim, Plaintiff must demonstrate that: (1) he belongs to a protected group; (2) he has been subject to unwelcome harassment; (3) the harassment must have been based on a protected characteristic of Plaintiff; (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) the employer is responsible for such environment under either vicarious or direct liability.  *McCann v. Tillman*, 526 F. 3d 1370, 1378 (11th Cir. 2008) (citations omitted).  Evaluating whether the harassment was sufficiently severe or pervasive involves objective and subjective components.  *Id*. Concerning the objective component, courts look to "all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  *Id*. (internal quotations omitted).

A hostile work environment is one that "is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create and abusive working environment."  *Rojas v. Fla.*, 285 F. 3d 1339, 1344 (11th Cir. 2002) (citations omitted).  The Eleventh Circuit has held that "[i]t is objectively unreasonable to believe that the use of racially discriminatory language on one occasion by one co-worker away from the workplace is enough to permeate the workplace with 'discriminatory intimidation, ridicule, and insult' and to 'alter the conditions of the victim's employment and create an abusive working environment.'"  *Butler*, 536 F. 3d at 1214; *see Rojas*, 285 F. 3d at 1344.

Although Plaintiff alleges that Caucasian employees have made racially derogatory comments about African-Americans, the record evidence contains merely one incident of a

Caucasian employee — Camp — using a racial slur.  The slur was directed at another employee who Camp had invited to his home.  Plaintiff's only information about the slur was what the other employee told him.  When Plaintiff decided to confront Camp about the incident, Camp said the word "slipped out."

Plaintiff has not presented evidence of other Caucasian employees using racially derogatory language.  Plaintiff acknowledges that African-American employees have used a variation of the racial slur, but he did not find these uses offensive.  Therefore, under these circumstances, Camp's one racial slur made outside of the workplace and outside Plaintiff's presence is insufficient to show that Plaintiff was subject to harassment severe or pervasive enough to alter his employment conditions.[32]  *See Butler*, 536 F. 3d at 1214.

Plaintiff also generally relies on Defendant's alleged history of hostility towards African-American employees to support his hostile environment claim, but Plaintiff has not articulated any specific facts he relies on to support his claim.  If Plaintiff relies on his evidence regarding Blue, Maddox, Coleman, Taylor, and Dixon, this evidence consists of racial discrimination *claims* that were dismissed on summary judgment, EEOC Charges that never resulted in lawsuits, and sworn testimony from an employee stating that Albright was disrespectful towards African-American employees.  Taken together, this evidence — a hodgepodge of unproven *allegations* of discrimination — is insufficient to establish that *Plaintiff* was subjected to a racially hostile

---

[32] Plaintiff relies on *Reeves v. C.H. Robinson Worldwide, Inc.*, a gender discrimination case under Title VII, for the proposition that a plaintiff can establish a hostile work environment claim when the harassing comments were not directed at the plaintiff himself but at the plaintiff's protected group.  594 F. 3d 798, 807 (11th Cir. 2010).  The court does not disagree with *Reeves*.  However, *Reeves* is distinguishable from this case because *Reeves* involved a "substantial corpus of gender-derogatory language" where the comments were made "on a daily basis."  *See Reeves*, 594 F. 3d at 804.  The evidence here, which consists of one instance of a racial slur, starkly contrasts with that in *Reeves*.  Plaintiff's claim fails because of the insufficient evidence to support a hostile work environment, not because Camp's comment was not directed towards Plaintiff.

environment.  At most, this evidence viewed in the light most favorable to Plaintiff supports the

conclusion that *other employees* have been discriminated against based on their race at work.  *See*

*Holifield*, 115 F. 3d at 1564.  This watered-down version of "me too" evidence is insufficient,

however, to create an inference that *Plaintiff* was discriminated against on the basis of his race.  *See*

*id*.

Moreover, in *Blue v. Dunn*, Blue similarly presented "me too" evidence to establish an

inference of discrimination by Dunn Construction Company against Blue.  (*See* Doc. # 32-14 at 14–

15).  Judge Acker considered the "me too" evidence and looked at whether the allegations of

discrimination occurred close in time to Blue's allegations, whether the other employees alleging

discrimination had similar job positions as Blue, whether they were demoted or terminated for

reasons similar to Defendant's proffered reason for demoting Blue, and whether there was a common

decisionmaker.  (*Id*.)  Judge Acker ultimately determined that the "me too" evidence was irrelevant

to Blue's case.  (*Id*.)  Further, Judge Acker concluded that "even if the EEOC charges were relevant

under FRE 401, they would be excluded as unfairly prejudicial under FRE 403.  Any probative value

of the EEOC charges, especially when such charges do not include a final determination, is

substantially outweighed by the danger of unfair prejudice to the defendant.  *See McWhorter v. [City*

*of] Birmingham*, 906 F. 2d 674, 679 (11th Cir. 1990), *reh'g denied*, 917 F. 2d 570 (11th Cir. 1990)."

(Doc. # 32-14 at 15).

The court finds Judge Acker's analysis persuasive and applicable to the case at hand.  It

would be unproductive and unnecessary for the court to parse through Plaintiff's evidence to explain

why each specific piece of evidence concerning Blue, Maddox, Coleman, Taylor, and Dixon is not

relevant to Plaintiff's case, particularly since Plaintiff has not bothered to explain why he believes

this evidence is relevant.  *See Resolution Trust Corp. v. Dunmar Corp.*, 43 F. 3d 587, 599 (11th Cir. 1995) ("[t]here is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment").  As a whole, however, the court concludes that this "me too" evidence does not involve (or is so sparse that the court cannot determine whether it involves) common decision-makers or job positions with respect to Plaintiff's evidence, and is not close enough in time to events about which Plaintiff complains.  In sum, the "me too" evidence is insufficient and not similar enough to Plaintiff's case to prove relevant here. Further, the EEOC charges would not be admitted under Federal Rule of Evidence 403. Accordingly, even taking the "me too" evidence into consideration, the court concludes that Plaintiff cannot establish a prima facie case for his hostile work environment claim.

## C.     Constructive Discharge

Defendant argues Plaintiff has failed to exhaust his administrative remedies for his constructive discharge claim under Title VII.  In Alabama, a charge of discrimination must be filed with the EEOC within 180 days of the allegedly discriminatory act as a prerequisite to asserting a Title VII claim based on that act.  § 2000e-5(e)(1); *Wilkerson v. Grinnell Corp.*, 270 F. 3d 1314, 1317 (11th Cir. 2001); *Ledbetter v. Goodyear Tire and Rubber Co., Inc.*, 421 F. 3d 1169, 1178 (11th Cir. 2005) (noting that Alabama is a non-deferral state).  A "plaintiff's judicial complaint is limited by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination."  *Gregory v. Ga. Dep't of Human Res.*, 355 F. 3d 1277, 1280 (11th Cir. 2004) (citations omitted).  Here, Plaintiff filed his EEOC charge on July 9, 2008, but alleged that he was constructively discharged on or about July 31, 2008 and did not resign from his employment with Defendant until August 5, 2008.  He therefore never filed a charge of discrimination asserting a

constructive discharge claim and cannot allege a constructive discharge claim under Title VII in this action.

With respect to Plaintiff's constructive discharge claim under § 1981, and even if Plaintiff had exhausted his Title VII administrative remedies, Plaintiff cannot satisfy the elements of a constructive discharge claim.  "A constructive discharge occurs when a discriminatory employee imposes working conditions that are 'so intolerable that a reasonable person in [the employee's] position would have been compelled to resign.'" *Fitz v. Pugmire Lincoln-Mercury, Inc.*, 348 F. 3d 974, 977 (11th Cir. 2003) (citing *Poole v. Country Club of Columbus, Inc.*, 129 F. 3d 551, 553 (11th Cir. 1997)).  The Eleventh Circuit uses an objective standard to evaluate constructive discharge claims.  *Hipp v. Liberty Nat'l Life Ins. Co.*, 252 F. 3d 1208, 1231 (11th Cir. 2001) (citing *Doe v. Dekalb Cnty. Sch. Dist.*, 145 F. 3d 1441, 1450 (11th Cir. 1989)).  The standard for proving constructive discharge is higher than that for a hostile work environment.  *Id.*; *see Barrow v. Ga. Pacific Corp.*, 144 F. App'x 54, 59 (11th Cir. 2005) (a plaintiff cannot meet the standards for a constructive discharge claim if he cannot establish a hostile work environment claim).  The court must find that "pervasive conduct by employers" occurred prior to finding that a constructive discharge occurred.  *Hipp*, 252 F. 3d at 1231.  Moreover, "[p]art of an employee's obligation to be *reasonable* is an obligation not to assume the worst, and not to jump to conclusions too fast." *Garner v. Wal-Mart Stores, Inc.*, 807 F. 2d 1536, 1539 (11th Cir. 1987) (finding that it would have been reasonable for the employee to complain about her position to her manager rather than quit after one day of being in an uncomfortable position).

Here, because Plaintiff has failed to establish the existence of a hostile work environment, he cannot as a matter of law establish that a constructive discharge occurred.  *See Hipp*, 252 F. 3d

43

at 1231; *Barrow*, 144 F. App'x at 59.  Further, Plaintiff's reasons for resigning — Camp's use of a racial slur outside of work to another employee, Plaintiff's beliefs that he should have been paid more, and Defendant allegedly treating Blue unfairly — do not amount to "pervasive" conduct by Defendant.  Although Plaintiff asserts that he complained about his pay to Yekel, Fallon, and Nichols to no avail, there is no evidence that he ever told them he believed he was paid less than he deserved *based on his race*.  Moreover, a reasonable person in Plaintiff's position would have done more to complain about his work environment before quitting his job, such as ensuring that his employer was aware that he believed he endured race discrimination.  Accordingly, Plaintiff cannot establish that he was constructively discharged.

## IV.    CONCLUSION

For the reasons stated above, Defendant's Motion for Summary Judgment (Doc. # 30) is due to be granted.  The court will enter a separate order granting the Motion.

**DONE** and **ORDERED** this <u>24th</u> day of May, 2012.

_____
**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE